Good morning. May it please the Court, Counsel. Your Honor, I'm Brian Whitaker from Spokane, Washington. I represent Robin Muller in this matter. Just by a frame of reference, Mr. Muller and I are approximately the same age. When we were in the third grade, President Richard Nixon signed an extradition treaty with the country of New Zealand. And Robin Muller eventually became a citizen of New Zealand. And as we grew up, each of us became associated with law, although not necessarily for the same reasons. And in the early 90s, Mr. Muller was in Spokane and got associated with a group of people that cost the Spokane federal court system a great deal of time and money. It cost a couple attorneys their license, and it all involved the distribution of narcotics. Now, Mr. Muller was originally in Northern California and was brought in by marshals, and a magistrate in California let him go to come up to Spokane to deal with his charges. I think that that act and his volitional arrival in Spokane kind of played well with the court. And after entering a plea to this conspiracy to distribute, Mr. Muller was given permission to go to Reno to get married because he was going to be going to jail, but he and his fiancée wanted to get married.  Certainly. But instead of coming back from Reno, he got on a plane and he went back to Tonga, which is where he was originally from. And then he spent the next 12 years in a variety of places in Micronesia and ended up in Auckland, New Zealand. Well, he was caught up with by law enforcement in Auckland and extradited. But during that process, Mr. Muller made some challenges to the extradition. One was that during the timeframe, the government had filed a failure-to-appear charge against him, and he brought up in his extradition proceedings with the Ministry of Justice in New Zealand his concern about that charge. And during that process, the Minister of Justice, I think his name is Mr. Hawk, wrote a letter saying to Mr. Muller, this is a process we have to go through, and I assure you, you have no concerns. We're following the process. And in the excerpt, the Ministry indicates to him on page 63, no, excuse me, that's where the treaty is. But the reference to the treaty on page 63 is, don't worry, the sentencing law that applies in the very first paragraph there at the top of that page, the sentencing law that's going to apply has to be one of the things that they tell us before we send you. The paperwork that was sent to New Zealand included the plea agreement. And the plea agreement, which is in the excerpt at page 53, clearly shows a sentencing range of 87 to 108 months, but, of course, the 10-year mandatory minimum. Page 78 is a copy, again, of the letter from the Ministry that says the FTA charge is not extraditable. And on the next page, it says, don't worry, according to the treaty, you can't be punished for anything other than what you've been extradited for. Now, anything other than what you've actually been extradited for. So this gets down to, can you be punished for something other than what you've been extradited for? Now, when he comes back, the FTA charge gets dropped, but the government submits, and as does probation, that the failure-to-appear action should now warrant the obstruction of justice three-point increase. Because, using WIT, we can view everything. Now, Lazarevich is a 98 case from this court that talks about a similar but slightly different situation. With that case, the issue becomes, is that person being punished again because he was found guilty in another jurisdiction and we're expanding his punishment under the sentencing guidelines? And the course of analysis of that case is interesting because some of the arguments that were made is, some of the arguments are, it's not fair to count as criminal history. Well, that's not accurate. That's what criminal history is for. But at the same time, his underlying charge is now being examined from the standpoint of it was used to further another criminal matter. So that was the argument that was made. But the true difference between that case and this case is the fourth point that this Court raised, and that was, well, there's nothing in the record to show that the rule of specialty is going to be applied in Mr. Lazarevich's cases, that the Dutch don't want him to receive any kind of sanction for his actions. And the Court relied on that as the final deciding factor as to why it was okay to increase the sentencing range from where it started to where it ended up in the Lazarevich matter. I submit to you that this record does have those indications that when New Zealand sent Mr. Mueller back to Spokane to be sentenced, it was their expectation that he would not be sanctioned for his failure to appear. Where were you quoting? Where in the record were you quoting New Zealand? The Ministry of Justice letter is on pages 78 and 79. It's Mark Burton is the Justice's name. Mr. Mueller had written a letter saying, I have these concerns. The last numbered paragraph is paragraph C, is the undertaking not to prosecute for non-extradition offenses. Now, I understand the word prosecute is there, but as it flips to the next page, it says, for any offense other than the extraditable offense disclosed by facts on which your surrender is granted. And the minister included the quotation, shall not be detained, tried, or punished. Now, I know the terms of art include you're not being punished for the failure to appear. You're being punished for the extra dish, excuse me, for the conspiracy to distribute. The punishment is being enhanced for the failure to appear. But all indications are that the Ministry of Justice was informed that Robin Mueller would be looking at an 87 to 108-month sentence, but facing a mandatory minimum sentence of 120 months. And that they did not have an expectation, according to this record, that he would be sanctioned any more than that period of time. Now, when he comes back, the judge repeatedly indicated that his trust had been violated, that he felt he had been basically conned by Mr. Mueller, and that while it wasn't the reason, he was content to give him this 151-month sentence, because in great part he had left for 12 years and felt that he should be punished for that. I stand for questions, but would like to reserve the balance of my time. Thank you very much. All right. May it please the Court. Tom Rice for the United States. I'm an assistant United States attorney from the Eastern District of Washington. There are five issues raised in the briefs. I won't address the other four issues and rest on the briefs on that matter. This issue with respect to the rule of specialty has been addressed by the Lazarevich opinion out of the Ninth Circuit, as well as two other opinions out of the Sixth Circuit. If I understand the reasoning of the Lazarevich, it's that, well, the extraditable the extradition treaty and everything else is done with a background of what kind of sentencing laws we have and everything else. So they understand that we might enhance for that. I mean, isn't that sort of part of the reasoning of the Lazarevich? Absolutely. But then, certainly, do the New Zealand authorities understand any such thing? Well, it's pure speculation on counsel's part what the New Zealand authorities considered in those proceedings. This issue wasn't raised below. It hasn't been decided by the district court at all. And the New Zealand authorities' files and records are not in this record. However, we do know that the plea agreement was provided to the New Zealand authorities, and that plea agreement provides that the defendant was to be brought back to this country to be sentenced up to life in prison. And that was the penalty. The offensive what? This conspiracy to distribute cocaine carries a penalty of 10 years to life, and they were advised of that. The plea agreement also had the sentencing range, the proposed guideline range, I gather. It also did, Your Honor. It was a preliminary calculation, and there was a lot of qualifications to it, including whether or not the defendant would qualify for the safety valve aspect, whether or not he would accept responsibility. That was conditional in that plea agreement. There was also a reminder, I believe on page two of the plea agreement, that the district court was not bound by any recommendation of the parties but could sentence up to life in prison. Also, the New Zealand authorities, we must assume, are presumed to have been aware of the United States Supreme Court case in Witt in 1995 that indicated that a court, in calculating the guidelines, can take in conduct of other offenses in calculating the base offense level and then continue to prosecute the person for that conduct later, and it does not violate the double jeopardy clause. Additionally, all these cases cited by the United States in support of that there is no violation of the rule of specialty were on the books, were decided cases in the Sixth Circuit and the Ninth Circuit, prior to the time that the Minister of Justice granted the extradition case. Finally, the words in the extradition treaty itself says that you will not be detained, tried, punished for any offense other than the extraditable offense disclosed by the facts of the case. It does not say that you will not be tried, detained, or punished for any conduct, and in this case, the extraditable offense was conspiracy to distribute cocaine. The failure to appear was dismissed. He was not tried, convicted, or punished for that offense. Specifically, the treaty does not cover conduct. In fact, it must be presumed to be known that New Zealand would know that the United States' sentencing system allows the district court to consider, without limitation, all evidence relevant to a sentencing hearing. And finally, the guidelines themselves are not binding on the court. As Judge Quackenbush thoroughly went through the 3553 factors in this case, he was not bound by that. So he certainly knew that he had broad discretion from 10 years to life in prison, and that's what he punished this defendant. Now, he was mandated by the Supreme Court to calculate the guidelines, consult those, but he was not bound by those. And so in this case, in no sense of the term could you say that the defendant was punished for the failure to appear offense. I think that's all true by our sentencing characteristics and by double jeopardy reasoning and everything else. If you just walked out on the street and grabbed somebody by the pelts and said, if we increase a sentence a couple of years because somebody failed to appear when we're theoretically sentencing them for some other crime, is that punishing them for failure to appear? I think the person would say, oh, yeah, that sounds like they're punishing them for failure to appear. They added three years to a sentence because he didn't appear. And, I mean, we've gotten used to this convoluted guideline thinking, but I don't know whether it's safe to assume that New Zealand has. Well, and I would just cite to the record and the timing, the chronology, all these cases that the government has cited in support of this were on the books when the minister of justice decided the case. Maybe we presume that. But they weren't on the books, of course, when the treaty was executed. No, but the treaty itself is a discretionary matter. Mr. Mueller attacked the treaty. He was arrested June 6th of 2006, and he attacked it through every level of the New Zealand court, to the highest supreme court of New Zealand. Not only that, he went beyond that. And then he appealed to the minister of justice for his discretionary relief after that. It wasn't until October 5th or, excuse me, October 1st of 2007 that the minister of justice decided the discretionary issue that he had. So it wasn't like the issue couldn't have been raised. The extradition process lasted more than one year and does include a discretionary aspect. And all the facts were on the table. The case law is clear. And the defendant and these guidelines are not binding. And the district court recognized that and felt that the 151-month sentence was reasonable. Thank you. Thank you. When I read the letter from the Ministry of Justice in New Zealand laying out what their analysis is of this situation, I failed to understand how I could be speculating anything. But I'm supposed to presume that that said same minister was reviewing WID at the time he was making his decision. The analysis here is this. I guess the question is whether our own case sort of authorizes that kind of a presumption. Well, the Euro case I think is the one that we need to focus on. And that is what did New Zealand think when they sent him back here? What did New Zealand think? Not what did the United States think at the time that Richard Nixon signed this treaty, a boilerplate treaty that was going around in those days. What was New Zealand thinking? The record shows that New Zealand was thinking that when they sent Mr. Mueller back, he would be punished for the cocaine distribution. The court record shows that the obstruction of justice enhancement is for failing to appear for court. We have to engage in a pretzel logic in order to overcome the common meanings of those words, the common meaning of those cases, and arrive at the conclusion that the minister did not mean that, what he said when he wrote that letter. The letter speaks on its own. I submit to you it says that when New Zealand sent him here, they expected him to get punished for distribution and not punished for failure to appear. Thank you. The matter will stand submitted. Thank you. We come to the next matter, U.S. versus Lincoln County.
judges: Pregerson, Canby, Hall